## Nichols, County Court Clerk, et al. v. Logan.

(Decided June 13, 1919.)

### Appeal from Boyle Circuit Court.

1. Statutes—Construction—When Words May Be Supplied.—The letter of the statute will not be followed when it leads to an absurd conclusion. The reason for an enactment must enter into its interpretation so as to determine what was to be accomplished by it, since the purpose is to give effect to the legislative intent, and in order to effectuate that intent words may be supplied, omitted, substituted or modified, and where words or figures have been erroneously used for others and the title and context afford the means of correction the proper words or figures will be substituted or supplied by the court.

2. Animals—Stock Claims Resulting From Injuries by Dogs.—So construed, chapter 112, Session Acts 1918 (article 3, chapter 5, third volume, Carroll's Statutes, 1918 edition) means that stock claims produced by injuries inflicted by dogs proven and in existence at the time of taking effect of that act and upon which no pro rata had been paid, shall not abate but shall be paid on equal terms with claims arising after the statute took effect and shall be of equal dignity.

3. Animals—Actions for Damages.—It is the duty of the claimant, sustaining damage, under the act to apply to the proper officer for the appointment of appraisers within twenty-four hours after he discovers the damage and locates the carcasses of his animals, and among other things the officer applied to shall certify on the appraisement the time of such application and that due diligence was made within the twenty-four hours thereafter to ascertain whose dog or dogs did the damage.

4. Animals—Stock Claims Produced by Injuries.—It is the duty of the county court clerk under the provisions of the statute to issue his warrant or order to the county treasurer in the order in which properly proven claims are presented to him, and it is the duty of the treasurer to pay them in the order in which they were issued and each of such officers will so keep their records as to preserve such priority, and if at the end of the year there

are unpaid claims they shall not abate but continue into the next year and be paid out of the fund collected for that year in their order of priority

5.. Animals—Live Stock Fund.—If at the end of any calendar year there shall be a surplus of the livestock fund after payment of all claims and charges against it the same shall be paid to the county school fund by warrant drawn by the clerk upon the treasurer.

HENRY JACKSON for appellants.

CHARLES C. FOX for appellee.

## Opinion of the Court by Judge Thomas—Affirming.

The purpose of this suit is to obtain a construction, and a direction for the proper administration of chapter 112 of the Session Acts of 1918, page 483. According to the first section of the act it "shall be known and may be cited as an act to promote and protect live stock industries in Kentucky," and is what is commonly known as the "dog tax law." The power of the legislature to enact the statute is not called in question, but if it were a similar statute having the same purposes in view and differing only in its administratve features was passed by the legislature and approved March 1, 1906, being chapter 10, Session Acts of 1906, page 25. This latter act was upheld as being within the constitutional powers of the legislature to enact, in the case of McGlone v. Womack, 129 Ky. 274. The reasoning of the opinion in that case meets with our approval and we would not be inclined to depart from it if the question was again presented.

The suit was filed by plaintiff and appellee, F. T. Logan, against the defendants and appellees, J. B. Nichols, county court clerk of Boyle county, and S. H. Nichols. treasurer of the county, and in the petition it is averred that on November 7, 1918, plaintiff lost forty-seven head of grade sheep which were killed by dogs and that the owners of the dogs were unknown to plaintiff; that plaintiff immediately and on the same day applied to a justice of the peace for the county and made known to him the fact of the killing of the sheep and the justice thereupon appointed two appraisers who assessed the damages at the sum of $22.50 for each sheep killed, amounting in the aggregate to $1,057.50. This assessment was made pursuant to the provisions of section 25

of the act, which is subsection 25 of section 68b, third volume, Carroll's Statutes, 1918 edition. It was further alleged that the justice of the peace before whom plaintiff made complaint certified on the appraisement that due diligence had been made to ascertain whose dog or dogs did the damage and as thus certified the claim was presented to the defendant county court clerk of the county and demand made of him that he issue his order or warrant upon the defendant treasurer in favor of plaintiff for the amount of the assessment of his damages and that the clerk refused to issue his order and the treasurer announced his purpose to not pay it if issued. Plaintiff prayed for a mandatory order against each of those officers directing and commanding them to discharge their duties under the statute as plaintiff construed it, i. e., that the county clerk be required to issue his order to the treasurer and that the latter be required to pay it on presentation.

The joint answer filed by defendants admitted the allegations of the petition but attempted to justify their respective refusals because of the great doubts which each of them entertained with respect to their duties under the peculiar phraseology of the act, and because of the facts alleged with reference to the number of claims on file. for payment out of the live stock fund of the county, which fund was insufficient to pay the claims in full, some of which had been filed during the month of December, 1917, and others between January 1, 1918, and March 28th following, when the act under consideration was approved, while still others were filed after the approval of the act. They alleged that a part of the live stock fund on hand accumulated under the provision of the 1906 act before the approval of the 1918 act, and which part had been turned back into the treasury of Boyle county by the Auditor of Public Accounts after January 1, 1918; that the remainder of the fund in the treasury of Boyle county was collected for license fees and under other provisions of the 1918 act, and that it was uncertain and doubtful as to whether the unpaid claims allowed in December, 1917, should participate at all in the fund collected during 1918 or whether the claims allowed between January 1st of that year and the time of the approval of the act under consideration should participate in such funds. Further, that if either

or both of such class of claims should participate it was also doubtful and uncertain as to how the participation or distribution should be made between those classes of claims and those allowed after the approval of the act, and if upon an equal basis, whether the claims should each be paid in full in the order in which they were allowed and established, or whether the entire fund for the year 1918 or any subsequent year should be pro rated upon the claims filed during and up to the expiration of the year and the balance be carried over as accumulated claims to participate in the collections for the next year.

It was also alleged in the answer that under the provisions of section 28 of the act under consideration plaintiff should not be allowed but $15.00 per head for the sheep he lost instead of $22.50, since the maximum amount for "grade sheep" is fixed by that section at $15.00.

An agreed statement of facts was filed and the court upon submission, directed by its judgment the defendant county court clerk to issue his warrant upon the treasurer to each claimant for the amount of his claim if established according to the provision of the statute under which it was made, including those established under the 1906 act during the month of December, 1917, as well as those established during the year 1918 up to the time of the approval of the act, and also those allowed and established afterwards during that year and that he should number such warrants and they should be presented by the claimant to the defendant treasurer, who was ordered and directed to pay them in full in the order in which they were issued by the county clerk, but that no claims made and allowed in the year 1917 or any prior year, should be honored by the county court clerk or the county treasurer if the claimant had received his pro rata on his claim for that year according to the provisions of the 1906 act.

It was further ordered that the county court clerk and the treasurer should proceed in the same way in the future, i. e., the one issuing warrants for claims and the other paying them in the order in which they were made and allowed. The judgment further reduced plaintiff's claim to the basis of $15.00 for each head of sheep lost by him. Both plaintiff and defendants objected and excepted to the judgment and each of them have appealed therefrom.

For convenience we shall hereafter refer to the 1906 act as the "old act" and to the 1918 act as the "new act." Both the old and new acts provided for the creation of a county live stock fund to be raised by a license tax levied upon each dog in the county. The new act provides for a larger fund by increasing license fees and augmenting it by the collection of fines for such violations as may be committed against its provisions. The old act provided for the payment out of the county fund for only loss or damage to sheep while the new act provides for payment out of the fund which it creates for loss or damage to sheep and other live stock and poultry. In both acts the injuries to be compensated for out of the fund were such as were committed only by dogs. Under the old act no claim for damages under it could be paid until it was considered and allowed by the fiscal court of the county, which could not be done by that court until the claim had been ascertained and filed with the county court clerk of the county as much as thirty days before the meeting of the court. If it allowed the claim it was then filed with the Auditor of Public Accounts and he, after the first day of the following January, would draw a warrant upon the treasurer of the state in favor of the claimant for the amount allowed by the fiscal court, but if the live stock fund to the credit of any county was not sufficient to pay all of the claims for that year in full the Auditor would pro rate it among all the claimants, issuing to each a warrant for his pro rata share.

There was no provision in that act whereby any unpaid portion of any claim, because of insufficiency of funds to pay it in full, might be carried forward into the succeeding year and either be paid out of the fund collected for that year or pro rate on the balance of the other claims which might accumulate during that year. In other words the old act seems to provide that when a claimant received his pro rata of the fund provided for in the year in which his claim arose and was allowed he was not entitled to collect any other sum thereon and the pro rata payment which he received would operate as an extinguishment of his claim. From the express requirements of the statute, however, it was impossible for the Auditor to pay or pro rate upon any claim which might arise thirty days before the last sitting of the fiscal court of that county for that year, since it could not consider

or pass upon any claim arising after that time, and it was all such claims and only such that the legislature in enacting the new act must have had in mind, for in section 15 thereof it is provided that "all moneys at present in the 'dog fund' derived from taxation of dogs under the existing (old) law, shall be turned into the said fund (county live stock fund.)" And by section 29 of the act it is provided that "any valid claim or parts thereof for loss or damage to sheep, horses, mules, cattle or swine which have accrued under any general or local laws at any time, prior to the passage of this act, shall not abate by reason of the repeal of such general or local act, but shall be paid out of the same fund of the proper county.

"All claims or parts thereof remaining unpaid for any reason at the close of any year shall not abate, but shall continue as claims until paid in full."

These provisions in the new act very clearly manifest an intention on the part of the legislature in its enactment to keep alive all claims for damages which may have accrued or which may have been established and not paid before the enactment of the new act and to consolidate any part of the fund of any county collected under any prior law with the one which the new act provided for, and out of the consolidated fund to pay all claims in full, including those which had not been settled according to the terms and provisions of the prior law under which they arose. This interpretation would permit all claims in existence at the time of the enactment of the new act and upon which no pro rata had been paid to participate in the live stock fund created by the new act upon the same basis and upon the same terms as claims accruing and established after the taking effect of that act, but it would exclude any participation in such fund of all claims upon which a pro rata had been made since they became extinguished and were not in the condition of "remaining unpaid" at the time of the passage of the new act.

It is further apparent that since the new act requires the payment of all claims to be made in full, and that if they are not paid at the end of any year they shall not abate, it was the intention of the legislature to allow the fund to accumulate from year to year until it was sufficient to pay all outstanding claims in full regardless of the year in which they arose or were fixed under the provisions of the act. This being true the judgment prop-

erly required the defendant county court clerk to issue his
order or warrant upon the defendant treasurer of the
county for each claim filed and properly proven before
him in the order in which it was presented and
that the treasurer should pay them as the fund
accumulates and in the order that the warrants
were issued by the county court clerk. This in-
terpretation might in some few instances require
a claimant to wait until what in some cases might appear
to be unreasonably long before he could collect his
money, but this is a matter over which we have no power
of correction, and, although true, it is better for the con-
venient and orderly administration of the law that it be
so, than to require a claimant to wait until the end of the
year and then receive only a pro rata payment and per-
haps repeat the same process the next year until the re-
maining portion of his unpaid claim would be so small
as to not justify him in looking after it. Besides that
method would entail an interminable amount of work
upon both the county court clerk and the county treas-
urer.

There is grave doubt from the terms of the statute
as to when the county school fund is entitled to receive
the surplus of the live stock fund for which provision is
made by section 37, which says: ''All moneys collected by
the various county clerks in this Commonwealth under
the provisions of this act shall, after deducting the
amounts paid out for loss, damages, compensation and
other expenses necessary for the enforcement of this act,
revert to the school fund of the county.'' This language
clearly contemplates a period when the items primarily
payable out of the live stock fund are to be deducted and
the balance or surplus, if any, disbursed to the county
school fund. It could not have been the intention of the
legislature to postpone that period from year to year
in anticipation of an excess accumulation of claims in
any one year above the amount of the fund collected for
that year. This construction would result in an indefinite
postponement of the time for the payment of the surplus
to the school fund and render the provision for that fund
practically nugatory. The purpose of the legislature in
the enactment of the section under consideration was, no
doubt, to require a distribution of any surplus of the
county live stock fund, after the payment of all claims,

fees and charges against it, once each year, and there could be no more practical time for that to occur than at the end of the year. So, if at the end of any year there is any such surplus in any county it will be the duty of the county court clerk to issue his order or warrant on the treasurer of the county for the full amount thereof in favor of the proper authority for the benefit of the county school fund, which warrant it will be the duty of the treasurer to pay on presentation, and the live stock fund for such county will start afresh at the beginning of the incoming year.

Section 25 of the new act provides how complaint by anyone suffering loss or damage to live stock or poultry shall be made and how his claim shall be established, and section 26 provides that the county judge or magistrate before whom complaint is made shall certify that the appraisement provided for in section 25 was regularly and duly made, after which the report shall be delivered to the claimant, his agent or attorney upon payment of cost and by him delivered to the county court clerk, who shall file it in his office. Section 27 makes it the duty of the county court clerk to receive the report and to issue his order or warrant upon the treasurer of the county in favor of the claimant for the amount of loss or damage sustained, but it is further provided in the last mentioned section that: ''No person shall receive any order for any claim until the county judge, justice of the peace, before whom the claim was made has certified that due diligence was made to ascertain whose dog or dogs did the damage and where the carcasses of the live stock or poultry killed, and for which damages have been assessed, where located within twenty-four hours after the assessment of damages.''

All parties to this suit insist that the language just quoted is so mixed, confused and disconnected as to be, standing alone, almost meaningless, and the lower court was, as we are here, called upon to construe it. It must be admitted that this criticism of the parties is not altogether unfounded, but when the entire act is considered in the light of the purpose and intention of the legislature in enacting it, we have but little trouble, through the aid of rules furnished by the law for the purpose, in determining what the legislature intended by the confusing language which it employed.

In the recent case of Neutzel, Clerk v. Ryans, 184 Ky. 292, the rules for the guidance of courts in the interpretation and construction of statutes are elaborately set forth. It is there shown that "the purpose is to give effect to the legislative intent. The will of the legislature, not its words, is the law." It is furthermore said in that opinion that "the object sought to be attained by the enactment of a statute being ascertained, it furnishes a most excellent aid in determining whether or not the words used convey the meaning intended by the legislature. When they do not, and from the context, the attendant circumstances and the object sought to be accomplished, this fact is made to appear, then the words may be modified consistent with the legislative intent. See Sams v. Sams, Admr., 85 Ky. 400, 3 S. W. 594; James, Auditor v. United States Fidelity & Guaranty Co., 133 Ky. 299, 117 S. W. 406."

Many cases from this and other courts are referred to in that opinion as well as text writers upon the subject and it is therein shown that if it is necessary to arrive at the intention of the legislature it is permissible to modify the meaning of words and even the structure of sentences and to substitute words which are entirely omitted and eliminate others which are found in the act being construed. Courts are also authorized, as will be seen from the authorities cited in that case, if it is necessary to carry out the purpose and intention of the legislature as gathered from the entire act, to reject words and even clauses as being redundant or surplusage and to rearrange sentences or clauses so as to make connected and complete sense and in furtherance of the plain intention of the legislature.

These general rules are expressed in the excerpt made in that opinion from Englich's Work on the Interpretation of Statutes, sec. 295, which says: "Where the language of a statute, in its ordinary meaning and grammatical construction, leads to a manifest contradiction of the apparent purpose of the enactment, or to some inconvenience or absurdity, hardship or injustice, presumably not intended, a construction may be put upon it, which modifies the meaning of the words, and even the structure of the sentence. This is done, sometimes, by giving an unusual meaning to particular words; sometimes by altering their collocation; or by rejecting them

altogether; or by interpolating other words; under the influence, no doubt, of an irresistible conviction, that the legislature could not possibly have intended what its words signify, and that the modifications thus made are mere corrections of careless language, and really give the true intention. The ascertainment of the latter is the cardinal rule, or rather the end and object, of all construction, and where the real design of the legislature in ordaining a statute, although it be not precisely expressed, is yet plainly perceivable, or ascertained with reasonable certainty, the language of the statute must be given such a construction as will carry that design into effect, even though in so doing the exact letter of the law be sacrificed, or though the construction be, indeed, contrary to the letter.'' See also Bowan v. Hamlett, 159 Ky. 184.

What, then, did the legislature intend to express by the language now being considered? Under the old act it was provided that a claim for damages should be made within twenty-four hours after the claimant discovered the injury to his stock. The new act provides in the latter part of section 25 that ''any owner or keeper of such dog or dogs shall be liable to the county in which the damages occurred to such live stock or poultry in a civil action for all damages and costs,'' etc. The language under consideration required the county judge or justice of the peace before whom the claim was made to certify that due diligence was made to ascertain whose dog or dogs did the damage and such certification was made a pre-requisite to the claimant receiving a warrant from the county court clerk. Manifestly it was not intended that the county judge or justice of the peace should only be required to give the certificate as to diligence in ascertaining whose dog or dogs did the damage within twenty-four hours after the assessment of the damage, and which assessment might be made at any time after the injury was done to the stock. This would not only be an abandonment of the purpose expressed in the old act (and plainly inferable from the terms employed in the new one), but would likewise militate against affording the county an opportunity to recover the damage from the owner of the dog or dogs that inflicted it. Everyone knows that the evidence leading to a discovery of whose dog or dogs did the damage is much fresher and more

easily obtained within twenty-four hours after the infliction of the damage than at a period more removed from that time, and it was the evident purpose of the legislature that the ''due diligence'' provided for should be exercised as near to the time of the infliction of the injury as possible and that the fact should be certified on the report of the appraisers. With this purpose in view we have no doubt but that we are authorized under the cases and text writers, *supra,* to conclude that the legislature, by using the language above quoted, intended to and did in effect say, as if it had been written: ''No person shall receive any order for any claim (for) assessment of damages until the county judge (or) justice of the peace, before whom the claim was made has certified that within twenty-four hours after the carcasses of the live stock or property killed (were) located due diligence was made to ascertain whose dog or dogs did the damage.''

In arriving at this conclusion we have transposed some of the clauses and inserted the words ''for,'' ''or,'' and ''were'' at their appropriate places, all of which we feel fully justified in doing under the authorities, *supra.* The trial court adjudged the meaning of the language under consideration to be substantially the same as we have given it and this we think was correct.

That portion of the judgment directing the county court clerk to number consecutively the warrants which he issues upon the county treasurer, while sensible and practical, cannot be regarded as any part of the construction of the statute. It is merely directory and for the convenience of the clerk in keeping his books. Any other method which would enable him to designate the order in which the warrants are issued would be sufficient, and the same is true with reference to the keeping of the books of the county treasurer.

The judgment in its entirety, conforming to the views herein expressed, meets with our approval and it is affirmed, but upon a return of the case the court will extend its judgment so as to direct the payment of any balance in the live stock fund at the end of the year to the county school fund as herein indicated. Whole court sitting.