286 P.2d 229

Walter F. MORGAN, Harold T. Morgan, George Cromar, Leslie Cromar, William Cromar, Eugene Cromar, and Arlene Cromar Gear, Plaintiffs and Respondents,

v.

Bert SORENSON, Dick Wind, Mrs. Bert Sorenson, and Mrs. Dick Wind, Defendants and Appellants, and Verrue Theobald, Administrator of the Estate of James T. Morgan, deceased, et al., Cross-Defendants and Respondents.

No. 8153.

Supreme Court of Utah.

July 7, 1955.

Eldon A. Eliason, Delta, for appellant.

P. N. Anderson, Nephi, Eks Ayn Anderson, Salt Lake City, for respondent.

CROCKETT, Justice.

This is an action to quiet title to realty, known as the Black Jack mining claims in the Erickson Mining District in Jaub County, Utah. Plaintiffs herein are the children and successors in interest of James T. Morgan and Frank A. Cromar, who located the claims in question about 1930. The plaintiffs contend that they have a valid and subsisting interest in the claims and that defendants' attempt to relocate the same properties beclouds their title. Defendants, on the other hand, assert that they validly relocated the claims in 1951 after plaintiffs had abandoned them by failing to perform the requisite annual assessment work on the claims for the year 1949–50.

After maintaining the claims for 20 years, James T. Morgan, then over 80 years of age, executed a quitclaim deed of his interest in the claims to his two sons, plaintiffs in this case, on April 19, 1949, and had the deed acknowledged. Shortly thereafter, according to the testimony of his son Walter F. Morgan, the elder Mr. Morgan personally handed the deed to him and received one dollar in consideration therefor, saying that "he just wanted us to have all his personal holdings because he was getting old." Several weeks later, notwithstanding the delivery of the deed, the elder Mr. Morgan filed in his own name as "co-owner" with the Cromars a "Notice of Intention to Hold Mining Claims" pursuant to the federal statute [1] which provides:

"That the provision * * * which requires on each mining claim * * * not less than $100 worth of labor to be performed * * * is hereby, suspended * * * until * * * the 1st day of July, 1949: *Provided*, That *every claimant* of any such mining claim in order to obtain the benefits of this Act *shall file* * * * *a notice* of his desire to hold said mining claim under this Act: *Provided further*, That any labor performed * * * during the year ending July 1, 1949, may be credited against the labor or improvements required to be performed or made for the year ending * * * on the 1st day of July 1950."

The assessment work on the Black Jack claims had been performed for the year ending July 1, 1949. And by complying with the statute Mr. Morgan could have such labor credited against the year ending July 1, 1950—the year in question.

Defendants urged at trial and upon appeal that because James Morgan had conveyed his interest in the claims to his sons he was no longer a "claimant" within the meaning of the above statute; that his filing was a nullity; that therefore no labor was credited against 1949–50; and that after July 1, 1950, the claims were forfeit and open to relocation; wherefore, they aver that their location in June, 1951, is good.

In awarding judgment to plaintiffs, the trial court took the position that the deed from James Morgan to his sons was not effective as a conveyance because it was intended as a deed of gift to take effect only upon his death. The court held further, however, "that the Notice of Intention to Hold Mining Claims * * * was sufficient * * * under the Act of Congress aforementioned and operated to avoid a forfeiture of the Black Jack claims under the circumstances of this case, even though it should be held that title to James Morgan's interest in said claims passed from him to Harold T. Morgan and/or Walter F. Morgan prior to the date of said Notice of Intention." We first consider the question whether the trial court was correct in the latter conclusion.

Underlying our mining law is a basic policy of encouraging the discovery and development of valuable mineral resources by rewarding and protecting individuals who locate mineral deposits and show good faith and diligence in developing their claims.[2] The law requires as a minimal showing of good faith and diligence, and perhaps to give notice to other interested persons, that at least $100 development work per claim be performed each year.[3] But at times when because of panic, war, depression or other hardship[4] such labor was thought too great a burden, Congress has seen fit to suspend the requirement for short periods to preserve the rights of individuals actively developing the claims who might otherwise lose them. Coupled with the suspension, however, Congress has each time required as a showing of good faith and diligence in lieu of assessment work the filing of a notice of intention to hold the claims.

Consonant with the law's general policy of giving succor to the developers of mining claims and of avoiding forfeitures, courts have uniformly been willing to credit the claimholder with work done on his claims for his use and benefit, despite very tenuous relationships between him and the

2. Chambers v. Harrington, 1884, 111 U.S. 350, 353, 4 S.Ct. 428, 28 L.Ed. 452; In re Suncrest Packers, Inc., D.C.D.Nev. 1934, 8 F.Supp. 917.

3. 30 U.S.C.A. § 28.

4. The requirement of assessment work was first suspended during the panic of 1893–94. It has since been raised during World Wars I and II and during the depression of the 1930's. With reference to the suspension statute in question here (see note 1 supra) the Senate Report on the bill explains as follows:

"Because of postwar conditions and scarcity of labor, the Eightieth Congress continued the assessment work suspension through the year terminating July 1, 1948. * * * a majority of the members of the committee were of the opinion that conditions in the mining industry as a whole, including the exceptionally severe weather that prevailed throughout the West during the past winter, warranted suspension of the required work for 1 year, or until July 1, [1949]."

one who does the labor. Work done by anyone in privity with the owner or by anyone having any semblance of legitimate interest in the claim is deemed sufficient;[5] or even work done by a stranger to the title is counted if it is done with the intention that its benefit inure to the claimholder.[6] In Anderson v. Caughey [7] the locator had attempted to make a gift of a one-fourth interest to his brother which was invalid because oral, but work done by the latter, apparently on his own account, saved the claim. In another case [8] one merely "permitted" to work a gold placer claim and keep whatever he produced was sufficiently "in privity" that his labor counted as assessment work. The case of Emerson v. McWhirter [9] states this indubitably sound principle, universally applied by courts in controversies over mining claims where forfeiture for failure to do assessment work is in question:

"Where a valid location of a mining claim has been made, and work done thereon in good faith, possession maintained, and no evidence appears from which an intention to abandon may be inferred, the courts should construe the law liberally, to prevent forfeiture."

It seems inescapable that the purpose of requiring assessment work and of requiring the filing of a "notice of intention to hold" is the same—to require evidence of diligence and good faith in developing the claims and to give notice thereof to others. There seems to be no good reason why the same principles which permit one other than the claimowner to perform assessment work for the latter's benefit should not apply with equal cogency to the filing by one other than the claimholder of a "notice of intention to hold" for the latter's benefit. It cannot reasonably be supposed that the difference between the wording in the one statute that the "labor shall be performed" and in the other more explicitly that the "claimant * * * shall file * * * a notice" was

---

5. E. g., Rickard v. Thompson, 9 Cir., 1934, 72 F.2d 807; Godfrey v. Faust, 1904, 18 S.D. 567, 101 N.W. 718. Work done by a stockholder inures to the benefit of a corporate claimholder though done voluntarily, Musser v. Fitting, 1915, 26 Cal.App. 746, 148 P. 536, and even where the stockholder testifies that the work was done on his own account, Wailes v. Davies, 9 Cir., 1908, 164 F. 397 (that testimony was here self-serving, however).

6. Thornton v. Phelan, 1924, 65 Cal.App. 480, 224 P. 259; compare Little Gunnell Co. v. Kimber, 1878, 15 Fed.Cas. p. 629, No. 8,402. While in the Thornton case the person performing the work may have been a stockholder in the corporate claimholder, that relationship is not determined as a fact or made the basis for the holding.

7. 1906, 3 Cal.App. 22, 84 P. 223.

8. Schlegel v. Hough, 1947, 182 Or. 441, 186 P.2d 516, 188 P.2d 158.

9. 1901, 133 Cal. 510, 65 P. 1036, 1038.

intended to make the substantial difference contended for by the defendants here, and adopted in the dissenting opinion. It is apparent from the debates on the first bill suspending assessment work that Congress understood that the person who should file notice was to be the same person who was obligated to perform the assessment work.[10] In both instances the person would *ordinarily* be the legal owner. We should show the same liberality in construing the suspension statute as has been used in construing the assessment work requirement, for the same purpose of avoiding forfeitures, which are regarded as *odious to the law.*[11]

We find very few cases concerned with the suspension statutes. Though none touch the exact question here confronting us, they are generally in accord with the principle just mentioned. In Nesbitt v. De Lamar's Nevada Gold Min. Co.[12] the Nesbitt Brothers, believing mistakenly that they had acquired ⅔ interest in a mine by purchase at a judgment sale which was in fact void, filed on behalf of themselves and their co-tenant Borth a notice in lieu of performing assessment work. In denying defendant's contention that their filing was invalid the Nevada court said, after noting that if labor had been performed by Nesbitt Brothers it would have satisfied the statute:

"Evidently, it was the intention of congress * * * that the recording of the prescribed notice should have the *same legal effect as performing the labor* * * *. The Fraction Mine being represented by one of the locators, A. Borth, and the said Nesbitt Brothers having had said notices recorded * * * at the instance of said Borth, as well as of themselves * * we are of opinion that said mine had not been forfeited nor subject to relocation * * *. The contention of counsel that, in the sense of the Statutes of 1893 and 1894, 'the claimant or claimants' authorized to secure the benefits of said acts must have a valid claim to the mining ground claimed, is

10. Various expressions recorded in the Congressional Record show this. At 2513, Oct. 14, 1893: "* * * the *person who seeks any benefit* from the suspension shall first file a notice. * * *" At 3034, Oct. 31, 1893: "The only people interested in this enactment are the people who are *claimants* for unpatented mining claims." At 3068, Nov. 1, 1893: "* * * the operation of the law which requires *claimants* to perform upon their claims $100 worth of labor * * * shall be suspended. * * *" At 3069, Nov. 1, 1893: "* * * a law which provides that the *owners* of claims of this character must perform a certain amount of work. * * *"

11. See, e. g., note 8 supra.

12. 1898, 24 Nev. 273, 52 P. 609, 610, 53 P. 178, affirmed 177 U.S. 523, 20 S.Ct. 715, 44 L.Ed. 872.

not, in our opinion, tenable." (Italics ours.)

In that case there was the request by Borth, one of the true owners, that the Nesbitts file the notice. That factor is not shown to be present in this controversy, but the decision illustrates a leniency in construing the suspension statutes consistent with that which we believe should be indulged here.[13]

The Alaska Federal Court's decision in U. S. Smelting Refining & Mining Co. v. Lowe [14] considered the meaning of the term *claimant* in a related statute.[15] The court "in keeping with the attitude of the courts toward forfeitures" painstakingly sought out two alternative interpretations for the word *claimant* which would avoid a forfeiture, neither of which was what defendants in the case before us urge is its plain meaning—that is, the holder of legal title to the claim.

It would be overtechnical and inconsistent with the purpose underlying our mining law for us in this case to place such a restrictive meaning on the term *claimant* that

the filing of notice by the elder Mr. Morgan would fail to preserve the claims for his sons. To hold that the father was not himself a "claimant" or at least that he might not satisfy the statute by filing *on behalf* of the claimants would ignore Mr. Morgan's close relation to the claims and the claimowners and the very natural interest he had in protecting these claims he had held for ·20 years and until just three months before the filing, and over which he thereafter continued to exercise complete and exclusive control. There is also testimony that he paid for and personally supervised labor on the claims in July, September and November, 1949. His whole conduct was an effort to perserve the claims and negatives any intent to abandon them. If the quitclaim deed in fact conveyed the claims to his sons, filing the notice was merely in implementation of his purpose of perfecting the gift. Beyond any doubt if he had done assessment work it would have protected the claims and would have inured to the benefit of his sons, and his filing the notice should have the same effect.

Furthermore, whatever else may be said or concluded about the conveyance, it can-

13. See also Donoghue v. Tonopah Oriental Mining Co., 1921, 45 Nev. 110, 198 P. 553, 15 A.L.R. 937, but see Pine Grove Nevada Gold Mining Co. v. Freeman, 1946, 63 ‘Nev. 357, 171 P.2d 366.

14. D.C.D.Alaska 1947, 74 F.Supp. 917, 926.

15. The statute provided that in an action to quiet title to mining claims failure

to file an affidavit of annual labor would throw the burden of proving such labor on the "claimant." The court held that *claimant* meant either the person who had the burden of proving affirmatively in the case that the labor was done or the person who had applied for patent. Either interpretation would preserve the rights of the prior locator in that case.

not be questioned that James Morgan was interested in the claims at least as a possible heir of his sons. Where he had such interest, his filing, coupled with the obvious intent to preserve the claims from forfeiture, would seem sufficient to permit him to file a notice within the requirements of the statute. If the fact situation were reversed, the reasoning would be even more obvious. Thus, if the sons of an elderly father had filed a notice which would preserve claims for him, it would plainly appear that they were doing it also to protect their own interest as expectant heirs. This would undoubtedly be deemed sufficient interest for them to qualify as "claimants" under the statute. That the situation here is the reverse merely changes the likelihood of realizing the expectancy, nothing else.

It seems grossly inequitable, even if the technical legal interest had been in the sons rather than in the father, that the mining claims here in question should be declared forfeit and open to encroachment by strangers to both father and son—strangers who admittedly relocated the claims not in ignorance of conflicting interests but with intent to displace the former owners who had actively developed the claims for many years and had given notice that they did not intend to abandon them. Uncertainty as to the status of title beween father and

son should afford no comfort to strangers such as defendants.[16]

Protection of the rights of one who lawfully locates a valuable mineral deposit requires us, in reason and justice and consistent with the law's purpose, to affirm the determination made by the trial court that the filing of notice to hold the mining claims met the requirements of the suspension statute.

 Affirmance of the trial court on the ground above discussed renders it unnecessary to treat the other question: whether the evidence could reasonably be regarded as clear and convincing [17] that the deed from James Morgan did not act as a conveyance of his interest in the mining claims to his sons.

Judgment affirmed. Costs to respondents.

McDONOUGH, C. J., and HENRIOD and WADE, JJ., concur.

WORTHEN, Justice (dissenting).

I dissent. With much of what is said I am in agreement. There are conclusions reached which I think unwarranted and important facts which I feel constrained to set out.

James Morgan and Frank Cromar, in 1930, located Black Jack claims 1 to 4 inclusive; Morgan claiming a $\frac{3}{4}$ interest and Cromar a $\frac{1}{4}$ interest. They were

16. See Nesbitt v. De Lamar's Nevada Gold Min. Co., note 12 supra.

17. Where a deed, executed and acknowledged, is found in the hands of the grantee, its invalidity can be established only by clear and convincing evidence, Chamberlain v. Larsen; 1934, 83 Utah 420, 29 P.2d 355.

amended locations of Black Jack claims 1 to 4 inclusive located in 1920 by James Morgan, Frank Cromar and others. Black Jack claim number 5 was located in 1930 by James Morgan alone.

Between 1930 and 1949 proof of annual labor was filed for the years 1937, '38, '39, '40 and 1941. For the balance of the time James Morgan filed notices of intention to hold the claims under the various acts of Congress relieving from the obligation to perform annual labor.

The trial court in its finding of fact No. 4 said:

"That on said April 10, 1949, James Morgan executed the quitclaim deed to Howard T. Morgan and/or Walter F. Morgan * * * and it appears probable that said deed was intended as a deed gift and to take effect upon death of said grantor * * *"

The deed was duly acknowledged and I am constrained to the belief that James Morgan divested himself of all interest in the claims. We quoted with approval in Chamberlain v. Larsen, 83 Utah 420, beginning on page 434, 29 P.2d 355, at page 362 the following:

"'The possession of a deed, duly executed, in the hands of the grantee, is prima facie, but not conclusive, evidence of its delivery. It therefore follows that he who disputes this presumption has the burden of proof, and must show that there has been no delivery. And not only must this presumption be overcome, but it is held that there is such a strong implication that it has been delivered when it is found in the hands of the grantee that only strong evidence can rebut the presumption.'"

There is no dispute that James Morgan handed the deed to Walter F. Morgan, his son, and one of the grantees a short time after April 10, 1949, the day of its execution and acknowledgement. The trial court in its pretrial order said:

"After discussion between counsel and the court, it appears that the issues between the plaintiffs and defendants are as follows:

"1. The plaintiffs Walter F. Morgan and Harold T. Morgan claim to be grantees of James Morgan and to have succeeded to his interest in the mining claims referred to in the complaint described as Black Jack Nos. 1, 2, 3, 4 and 5 in the Erickson Mining District, Juab County, Utah.

"2. The plaintiffs George Cromar, Leslie Cromar, William Cromar, Eugene Cromar and Arlene Cromar Gear claim to be heirs and successors in interest of Frank A. Cromar, now deceased, who was one of the locators and owners of the above mentioned mining claims."

The court stated the issue as embodied in the claim of the Morgan sons that they were *grantees* of James Morgan. The court was warranted in stating the issue that way because in plaintiffs' answer to defendants' cross complaint, plaintiffs de-

nied that James Morgan, deceased, left any estate. This allegation is inconsistent with the invalidity of the quitclaim deed. If James Morgan left no estate, it was in part due to the fact that his quitclaim deed to his sons divested him of his property. If the deed was void, as the trial court suggested, then the notice of intention to hold filed by James Morgan was efficient to avoid any forfeiture and the locations made by defendants on ground not then open to relocation were invalid.

But the majority opinion is not rested on the invalidity of the quitclaim deed. I cannot agree with the argument or the conclusion of the majority opinion, although under my view of the case the same result may follow. The majority opinion seems content to conclude that:

"There seems to be no good reason why the same principles which permit one other than the claimowner to perform assessment work for the latter's benefit should not apply with equal cogency to the filing by one other than the claimholder of a 'notice of intention to hold' for the latter's benefit."

The majority opinion makes the end which it seems desirable sufficient to justify an unwarranted interpretation of the statute. It says:

"If the quitclaim deed in fact conveyed the claims to his sons, filing the notice was merely in implementation of his purpose of perfecting the gift. Beyond any doubt if he had done as-

sessment work it would have protected the claims and would have inured to the benefit of his sons, and his filing the notice should have the same effect."

It is well to look at the Federal Statute providing for the doing of annual labor and compare its language and its purpose with the Statute which suspended the doing of the annual labor. Section 2324 of the Revised Statutes of the United States provides in part as follows:

" * * * On each claim located after the tenth day of May, eighteen hundred and seventy-two, and until a patent has been issued therefor, not less than one hundred dollars' worth of labor shall be performed or improvements made during each year * * * and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location. * * *"

It will be observed that this section makes no mention of the locator, owner or claimant in connection with the annual labor. It requires only that—"on each claim—$100 worth of labor shall be performed during each year—"

Reference to the cases cited in the majority opinion illustrate how varied are

the situations where the work done by one other than the claimant or the owner will count for representation work. Those cases are potent argument that the courts have given a common sense interpretation to Section 2324, Revised Statutes of the United States, requiring only the performance of $100 worth of work each year.

That section does not say the owner or claimant shall do or cause to be done $100 worth of work on each claim. Hence the liberal attitude of the courts in holding the work done by person in privity of title with the owner, work done gratuitously, work done by an option holder, work done by a lien holder and work done by a stockholder of a corporation will count as annual labor.[1]

It is stated in American Mining Law, Volume 1, at page 287, Section 481, under the general subject annual expenditure and under sub-title "By Whom Made":

"The annual expenditure may be made by the locator, his heirs, assigns or legal representatives or by some one in privity therewith or by one who has an equitable or beneficial interest in the property. A stockholder in a corporation claiming the property or a receiver appointed by a court, are within the rule. It is sufficient if the work done is gratituously contributed; but labor done or improvements made by a trespasser or a stranger to the title will not inure to the benefit of the owner."

The majority opinion takes an unwarranted leap and blandly asserts:

"There seems to be no good reason why the same principles which permit one other than the claimowner to perform assessment work for the latter's benefit should not apply with equal cogency to the filing by one other than the claimholder of a 'notice of intention to hold' for the latter's benefit."

The majority opinion cites with confidence the Nevada case of Nesbitt v. De Lamar's Nevada Gold Min. Co.[2] A casual reading of that case will disclose that it gives no support to the position taken here by the majority opinion. The plaintiff, Nesbitt, filed a protest in the United States Land Office at Carson City to the issuance of a patent to the Sleeper Mine. He also filed an adverse claim to that portion of the Sleeper Mine embraced within the boundaries of the Fraction Mine, claiming said Fraction Mine for himself and his alleged co-owners George Nesbitt, his brother and A. Borth as tenants in common.

The evidence showed that A. Borth, W. De Beck and H. Stevens located the Fraction Mine in May, 1892; no assessment work was done on the Fraction Mine in either 1893 or 1894. However, the Nesbitt Brothers in December of 1893 and in December of 1894 had a notice recorded in

1. Morrison's Mining Rights, 16th Edition, page 114.

2. 52 P. 609, 610.

the proper county declaring their intention in good faith to hold and work the mine. The plaintiff claimed that he and George Nesbitt, his brother, had acquired all the right, title, interest and claim of W. De Beck and H. Stevens in and to the Fraction. Their claim of title was founded on an execution sale. The court held the sale void on the ground that the court in which judgments were entered against De Beck and Stevens never acquired jurisdiction of the defendants.

The important proposition raised, and the one that discloses that the case does not support the contention of the majority opinion is the following observation of the Nevada court:

"The vital question in this case is whether the said notices the Nesbitt Brothers caused to be recorded, of their intention to hold and work said mine, had the legal effect of saving the mine from being subject to relocation for any period of time. In determining this question, it is not necessary to consider what legal value said certificates of sale and deeds may have, if any, except as evidence tending to show the good faith of the Nesbitt Brothers and their *co-claimant*, A. Borth, in all that they did with reference to said mine. The evidence discloses that, from the date of said sales, A. Borth regarded the Nesbitt Brothers as having acquired all the interests of De Beck and Stevens in said mine, and that the Nesbitt Brothers and A.

Borth mutually recognized each other as co-owners of said mining claim, as tenants in common; that upon *consultation* and *agreement* between them, *and at the request of A. Borth,* the Nesbitt Brothers had said notices recorded in lieu of performing the annual labor; * * *." (Emphasis ours.)

It will be observed that the judgment of the court is rightly rested upon the fact that A. Borth, who was a legal owner and whose claim could not be assailed, *requested* the Nesbitt Brothers to file the notice in lieu of annual labor.

The Nevada court further observed at page 610 of 52 P.:

"The Fraction Mine being represented by one of the locators, A. Borth, and the said Nesbitt Brothers having had said notices recorded, in pursuance of said agreement, and *at the instance of* said Borth, as well as of themselves, * * * we are of opinion that said mine had not been forfeited nor subject to relocation * *."

The Nevada court correctly interpreted the suspension acts of 1893 and 1894, which act provided:

" * * * that the *claimant* or *claimants* of any mining location, in order to secure the benefits of this act, shall *cause to be recorded* in the office where the location notice or certificate was filed * * * a notice that he or they in good faith intend to hold and work said claim.' "

The decision of the Nevada court in recognizing the validity of the notice filed by the Nesbitt Brothers *at the instance and request of A. Borth, a claimant,* is clearly correct.

The language of the Act of Congress under which James Morgan filed the notice of intention to hold is quite different from the language requiring annual labor. The 1949 Act, after declaring that the provisions of Section 2324, Revised Statutes of the United States requiring annual labor shall be suspended as to all mining claims in the United States, until the hour of 12 o'clock meridian on the first day of July, 1949, adds:

> "*Provided,* That every *claimant* of any such mining claim in order to obtain the benefits of this Act *shall file,* or *cause to be filed,* in the office where the location notice or certificate is recorded, on or before 12 o'clock meridian of August 1, 1949, a notice of his desire to hold said mining claim under this Act: Provided further, That any labor performed or improvements made on any such mining claim during the year ending July 1, 1949, may be credited against the labor or improvements required to be performed or made for the year ending at 12 o'clock meridian on the 1st day of July, 1950." 63 Stat. 200.

It would appear that no strained or unnatural meaning was intended to be given the term *claimant* and for the purpose of the act it must be presumed that it was to be given its ordinary meaning. *"Claimant"* is defined in Webster's New International Dictionary, Second Edition, Unabridged, *"one who asserts a right or title."*

I am unwilling to permit my sympathy for plaintiffs to bandage my eyes to what I consider the clear and unambiguous meaning of the Suspension Act of 1949.

The Act predicates its benefits on the condition "That every claimant of any such mining claim in order to obtain the benefits of this Act *shall file,* or *cause to filed * *.*"

As heretofore observed James Morgan was a claimant only if he still owned the claims. If he no longer owned the claims he could not be a claimant.

Again I quote from the majority opinion:

> "It would be overtechnical and inconsistent with the purpose underlying our mining law for us in this case to place such a restrictive meaning on the term *claimant* that the filing of notice by the elder Mr. Morgan would fail to preserve the *claims* for his sons."

If the *claims* as suggested belonged to the sons they were the claimants. If, as was the situation in the Nesbitt case, the Morgan sons or one of them had requested James Morgan to file the notice, then the sons, the claimants, would have complied with the Act by causing the notice to be filed.

Had James Morgan recited that he was filing the notice at the request of his sons, the situation would be different, or on be-

440

half of his sons it would be consistent. However, an examination of the notice of intention to hold filed by James Morgan (Plaintiffs' Exhibit 8) will disclose that it did not purport to be filed on behalf of the sons. James Morgan didn't purport to act for his sons or recite that it was filed to protect them. After setting out the names of the claims and that the owners desire to hold the mining claims under the Act of Congress concluded thus:

> "The owners being James Morgan of Eureka, Juab County, State of Utah, whose co-owner is the estate of F. A. Cromar, deceased of Eureka, Juab County, State of Utah.
> Signed: James Morgan
> Co-Owner"

Let us examine some of the cases recognizing annual labor performed by one other than the *owner* or claimant and see if the same person could reasonably be understood to be the claimant of the property.

As observed in the majority opinion, labor performed by a stockholder of a corporation has been held as representation work.

Can it reasonably be contended that a stockholder in a mining corporation might file a notice of intention to hold a claim, particularly if as here, he asserted that he was the owner of the mining claim and did not state that it was filed at the request of the corporation or for the benefit of it?

Would it be contended that a lessee or licensee could file the notice as owner and avoid the forfeiture?

Would it be contended that in the case cited in the majority opinion, Schlegel v. Hough, 182 Or. 441, 186 P.2d 516, 188 P.2d 158, Carl Anderson who was permitted by Schlegel to go upon the claim and work and was to retain whatever gold he might recover in such work could file in his own name a notice of intention to hold which would protect the claim against forfeiture?

Would it be contended that a mortgagee could file the notice of intention as was done in this case by James Morgan—and prevent a forfeiture of the claim? Might an optionee file such notice? The cases hold that both mortgagee and optionee may do work to meet the required annual labor, but it does seem far fetched to hold that either is a *claimant* authorized to file the notice.

I see no escape from the conclusion that after James Morgan divested himself of all his interest in the claims he was no longer a "claimant." It was observed by the court in Wailes v. Davies,[3] "The federal act in relation to the performance of annual labor says nothing as to the person by whom it shall be performed." But Public Law 107 allowing the filing of the notice in lieu of annual labor is specific that it be *filed* or *caused to be filed* by the claimant.

The decision of the Supreme Court of Idaho in the case of Carrey v. Secesh

---

3. C.C., 158 F. 667, 672.

Dredging, Mining & Milling Co., Inc.,[4] gives support to the position that the suspension act is a special act, enacted to meet an emergency and should be strictly construed. In that case a notice of intention to hold was filed in compliance with the Act of Congress suspending annual labor for year 1932.

At the time the notice was filed the claim was in default—the annual labor had not been performed for two years. In holding that the notice of intention to hold did not satisfy the statute as to resumption of work the Idaho court said, at page 774 of 39 P.2d:

"The resolution of June 30, 1932, supra, is clear and explicit in its provisions suspending assessment work and improvements on mining claims for a period of a year, commencing July 1, 1931, and ending July 1, 1932. The resolution is not ambiguous or uncertain in any particular. Assessment work and improvements, in language which cannot be misunderstood, are suspended for a period of a year, and for that period only. Nor does that resolution, either expressly or impliedly, suspend assessment work for previous years, or for any year other than that clearly and definitely fixed. Nor does it provide, either expressly or impliedly, that the suspension of assessment work, for the period so fixed shall amount to a resumption of work."

The Idaho court further observed, at page 775 of 39 P.2d:

"And, further, to construe that resolution into the equivalent of a *resumption of actual work* and the performance of annual assessment work for the years in which appellant completely defaulted would encourage and approve long and continued failure to perform required annual assessment work, and thus seriously affect the development of our mineral resources, contrary to public policy, and result in great public mischief. In Lewis' Sutherland on Statutory Construction (2d Ed.) § 489, it is said: 'A construction which must necessarily occasion great public * * * mischief must never be preferred. * * * Of two constructions, either of which is warranted by the words of the amendment of a public act, that is to be preferred which best harmonizes the amendment with the general tenor and spirit of the act amended.'"

I, therefore, am of the opinion that the notice filed by James Morgan availed the plaintiffs nothing.

This conclusion, however, is not conclusive of the case. It becomes necessary to determine whether the required assessment work was performed on the claims during the year July 1, 1949, to July 1, 1950. As to this matter, the trial court made no find-

4. 55 Idaho 136, 39 P.2d 772.

ing of fact, it being unnecessary under its view of the case. Under my view, however, a finding on that matter is imperative. Orson H. Evans who had leased the claims from James T. Morgan testified that he did certain work in the fore part of the month of July, 1949, and that he purchased timber and gasoline which he expended on the claims. There was testimony that on three occasions between July, 1949 and the death of James Morgan on November 29, 1949, he accompanied Victor Bray to the claims where they stayed for three days on each occasion while Bray performed labor on the claims and that in payment for Bray's labor Morgan cancelled repayment of a loan of an undisclosed amount of money which he had made to Bray and, in addition, paid Bray thirty dollars. There can be no question that the value of the work done and the money spent on the claims by Evans as well as the work done by Bray would count as annual labor for the year July 1, 1949 to July 1, 1950.

The trial court found, and the evidence supports the finding, that between July 1, 1948, and July 1, 1949, more than $500 worth of labor was performed upon the 5 claims in question.

If the required work was done on the claims between July 1, 1949 and July 1, 1950, the claims were protected against relocation before July 1, 1951. The defend-ants claims were located during the month of June, 1951.

Apparently an affidavit of labor and improvements performed as required by Section 40–1–6, Utah Code Annotated 1953, was not filed by the plaintiffs, but such failure to file does not render the claims open to relocation if the owner can prove in fact that the assessment work was done.[5] It should also be remembered as was said in Wailes v. Davies, supra, that "The burden of proof is always upon the party seeking to establish the forfeiture of a mining claim. Courts have always been very reluctant to enforce forfeitures; 'they have settled the doctrine that a forfeiture cannot be established except upon clear and convincing proof of the failure of the former owner to have work performed or improvements made to the amount required by law.' "[6]

Because the trial court made no finding as to what work was performed and improvements made during the year July 1, 1949, to July 1, 1950, and because such a finding is imperative to the disposition of this case, I am of the opinion that the judgment entered below should be reversed and the case remanded to the trial court to make that determination, taking additional evidence if it deems it necessary or advisable.

5. Murray Hill Min. & Mill. Co. v. Havenor, 24 Utah 73, 66 P. 762.

6. See 2 Lindley on Mines 645; Hammer v. Garfield Min. & Mill. Co., 130 U.S. 291, 301, 9 S.Ct. 548, 32 L.Ed. 964.

One more matter should be noted. Defendants did not locate their claims until June, 1951. Even if the necessary assessment work was not done for the year July 1, 1949 to July 1, 1950, nevertheless if there was a bona fide resumption of work by the plaintiffs after July 1, 1950, prior to the locations made by the defendants, the plaintiffs would be protected.[7] By the express provisions of Sec. 2324 quoted herein property is open to relocation where there has been a failure to do annual assessment work, provided that the original locators, their heirs, assigns or legal representatives have not resumed work upon the claim after failure and before such location.

I am of the opinion that the judgment should be reversed and the case remanded for further proceedings in accordance with the directions herein given. No costs should be awarded.

The majority opinion indicates that notice of intention to hold would be good whether filed by plaintiffs or by the father James Morgan, that both the sons and the father qualify as *claimants* under Public Law 107. This position I believe is untenable and ignores the plain language of the suspension statute, in order to avoid a forfeiture.

The Act is not one effecting a forfeiture, rather it was enacted to avoid a forfeiture.

7. Morrison Mining Rights, 16th Ed., p. 124; Belk v. Meagher, 104 U.S. 279, 26

Its language is not to be ignored to accomplish a result deemed desirable by the *majority* opinion.

The majority opinion by adopting an illogical premise proceeds to arrive at a logical conclusion. It says:

"It seems inescapable that the purpose of requiring assessment work and of requiring the filing of a notice 'of intention to hold' is the same—to require evidence of diligence and good faith in developing the claims and to give notice thereof to others."

Wherein does the filing of the notice furnish *evidence of diligence and good faith in developing the claim*. It is permitted to relieve one who has failed to furnish evidence of diligence in developing the claim. It relieves from doing what the mining laws have always asked for. As was stated in Wailes v. Davies, supra:

"The federal act in relation to the performance of annual labor says nothing as to the person by whom it shall be performed. The obvious purpose of the law is to *exact work as an* evidence of good faith on the part of the owner, and *also to discourage the holding* of mining claims without development or intention to develop, to the exclusion of others who could and would improve such ground if they had opportunity. * * *"

L.Ed. 735; Klopenstine v. Hays, 20 Utah 45, 57 P. 712.